IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DIVISION OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MONICA VOSS, | )( | Civil Action No.: 4:17-cv-1408 |
| | )( | |
| *Plaintiff,* | )( | |
| | )( | |
| V. | )( | JURY TRIAL |
| | )( | |
| FORT BEND COUNTY, TEXAS; and | )( | |
| GREGORY G. GOODE, *Individually,* | )( | |
| | )( | |
| *Defendants.* | )( | |

## DECLARATION OF MONICA VOSS

1.	I am Monica Voss. I am at least 21 years of age and under no disability. I am the plaintiff in the above titled and numbered cause. I have first-hand knowledge of the facts in this declaration and such facts are true and correct. Exhibit 2 is a true and correct video of the events.

2.	I am 58 years old, married with children and live in Fort Bend County. I was a Harris County Sheriff's deputy from 1984 until my retirement in 2008 as a sergeant. While a deputy I was promoted to detective and worked in the child abuse unit for about 9 years. I have never been disciplined as a law enforcement officer. I live with my minor daughter K.V., and two other disabled children. I take care of my elderly mother.

3.	I adopted K.V. from Russia when she was one year old. Prior to being adopted K.V. was a "crib baby" and had been severely malnourished and mistreated and lacked medical care. K.V. has been diagnosed with possible fetal alcohol syndrome. Since I adopted K.V. I have cared for and treated her as any mother would any child and I love her very much. School professionals and other mental health care providers have also diagnosed K.V. with several other severe mental health disorders such as Attention Deficit Hyperactivity Disorder, Oppositional Defiance Disorder,

Reactive Attachment Disorder, Dysautonomia, and is possibly bipolar. K.V. takes medication prescribed by a psychiatrist for behavior.

4. June 20, 2016, around midnight, I was sitting at my computer in the front part of her house. The rest of her family including K.V. were in their rooms for the night. I heard someone knock on the front door and say "Sheriff's department" very loud. I could see it was a uniformed person through the glass of the door. I was frightened by this late-night visit but immediately answered the door not knowing what was happening. There were two Fort Bend County Sheriff's deputies there.

5. Deputy Good asked if I was Monica and I said yes. Deputy Goode told me he was there at the request of Texas Child Protective Services to do a welfare check on K.V. who was allegedly threatening to commit suicide from her bedroom.

6. I have never nor has anyone in the my household has ever abused K.V. in any way.

7. I was quite shocked as the family had just returned from a great family weekend trip out of state. I immediately called for and went to get K.V. from her room and awoke my husband to come to the front foyer to tell him what was happening. K.V. came to the front foyer where the deputies and I were. Deputy Goode asked K.V. if she was depressed and if she was going to harm herself and K.V. plainly denied these actions to Deputy Goode. K.V. was laughing about it and appeared shocked by Deputy Goode's questions.

8. I answered all questions that were asked of me and I never threatened anybody at any time.

9. I woke my husband Mark to come out and told Mark briefly what was happening. Deputy Goode told Mark why he was there and they made small talk about law enforcement. Mark,

*DECLARATION OF MONICA VOSS*                                                                 Page 2

seeing it appeared everything was fine, went back to bed as he had to get up very early for work the next day.

10. I then suggested to Deputy Goode he could interview K.V. out of my presence if he wanted to.

11. After 20 or 30 minutes I went outside to see what was taking so long. I then told Deputy Goode that if K.V. was depressed or needed mental help I would certainly provide for that. Previously, K.V.'s psychiatrist had suggested Methodist Hospital or St. Luke Hospital if a problem ever arose. I knew she could be on her way downtown while waiting on the emergency call back from K.V.'s psychiatrist.

12. I told K.V. to get into her car for the trip to the hospital. Deputy Goode then said K.V. could not and that he would not allow K.V. to go with me.

13. Being at an impasse after Deputy Goode had taken K.V. into custody I went back inside my house for a few minutes to sort the confusing situation out. Based upon my many years of service in the Harris County Sheriff's Office child abuse unit and CPS I knew that K.V. may end up in a temporary foster home even without any valid reason.

14. I then returned outside and asked Deputy Goode if had a card with is name on it and I told him I was leaving. He gave me a card and said I was free to leave. I was walking back inside my residence after he handed me the card when he began to yell at me, "Ma'am, Ma'am, I need your ID. I told him I did not have it. He yelled at me to go inside and get it because he needed it. I refused to go inside my residence. This is when I was arrested for failure to ID. When Deputy Goode began to asked me questions, I stated I wanted to speak with an attorney and asked what I was being arrested for. Deputy Goode stated he had K.V. in custody in the backseat of the FBCSO's patrol car and I was not allowed to talk to her. Deputy Goode then asked me for my

physical identification card and I said it was in the house. Although I was not under arrest or detention at that time Detective Voss stated that she wanted an attorney present for any further questioning.

15. Deputy Goode then arrested me for failure to identify to a police officer. I knew this was a false arrest as I had not committed the offense of failure to ID. Deputy Goode handcuffed me and put me in the back of the patrol car.

16. After a few minutes had elapsed I began to get sick due to the stress of K.V.'s predicament and the deputies unjustified actions. I knocked on the squad car window with my head as I did not want to vomit in the squad car. A deputy opened the squad car door and let me sit on the ground.

17. As I had recent nerve surgery on my elbow the behind the back handcuffing was hurting very bad and the cuffs were changed to the front.

18. I called a friend and told him what was happening to which the friend suggested calling Deputy Goode's captain Holtz. Deputy Goode was standing right over me and told me that Holz was his captain but he was not going to call him. Deputy Goode asked me if I wanted him to jerk that phone out of my hand.

19. I told Deputy Goode I was trying to record what was happening. Deputy Goode replied not to worry as it was all being recorded. I asked Deputy Goode to call his supervisor as I did not believe K.V. was being properly cared for and her arrest was unlawful. A few minutes later, while I was still sitting on the ground, another FBCSO patrol car came up with Sgt. Ellis. After Goode spoke with Sgt. Ellis for around 20 minutes Sgt. Ellis walked over and began to talk to me. Sgt. Ellis said it appears everything was just a big misunderstanding that had gotten out of hand. After a few moments the deputies took the handcuffs off. Sgt. Ellis stated they were calling

a mental health person out to interview K.V. before they released her just to make sure K.V. was OK.

20. A mental health care worker from Texana Crisis Center eventually arrived and interviewed K.V. and then K.V. was released.

21. I was in the custody of Goode for around an hour.

22. The events have caused me at least past pain and suffering as well as past present and in all likelihood future anxiety, lost sleep, fear, embarrassment, anger, loss of enjoyment of life, and other mental anguish. It caused me great humiliation to be handcuffed and arrested in front of K.V.

23. I have read the summary judgment motion and the attached affidavits of Goode (**Exhibit1**); McGuigan (**Exhibit 2**); and Ellis (**Exhibit 3**).

24. Goode claims in page 1 of his summary judgment motion (Goode's MSJ). There are no specifics of how I "interfered with Public Duties." According to Texas law it has to be more than verbal. When I put K.V.in the car I was taking her to mental health care and I told Goode that. I have always cared for my child. I was going to call her doctor to see which hospital her doctor would want her to go to if need be. When Deputy Goode advised I could not leave with her, I did not leave with her. Deputy Goode fails anywhere in his report to indicate he had spoken with CPS and learned several other calls had been made to CPS by the same person and was unsubstantiated. This was a person, Sandy Edwards, angry because I would not allow her to interfere with my parental authority of my child. I do not have a long-standing feud with this person. Fort Bend County SO had received these reports and also determined there was no criminal offense prior to this date. I had also had knowledge from another adult and from K.V. that K.V. and Sandy Edwards had conspired to call CPS on me due to my normal parental decisions of K.V.

that she as a rebellious teenager did not want to follow the rules. I have never abused my children. I have always provided well above and beyond what most reasonable parents would. K.V. has been interviewed by numerous professionals how devastating this was to her. During this incident I was frustrated with K.V. as she is a manipulative teenager and had even admitted to me that she had conspired with Sandy Edwards to call CPS on me because I would not allow her certain things, such as to socialize with certain people, or provided certain electronic devices. I also knew K.V. to be very capable of manipulating others such as law enforcement officers.

25. Regarding page 2 of Goode's MSJ about his false concern for fear of me being able to return inside my residence to obtain a firearm: I had already been back in my residence once. There was no credible report that I possessed a firearm. I was instructed by Deputy Goode to go back inside my residence to obtain my ID. It is plainly on the audio/video submitted by Fort Bend County. I walked out of my residence, calmly, I asked Deputy Goode for business card with names on it and told him I was leaving. He gave me a card with names on it and said OK. As I was walking back to my door he begin to yell at me, "ma'am". Told me he needed my identification and if I didn't have it that I needed to go get it. He very plainly tells me to go inside my house to get my ID. I do not like firearms. I do not own a firearm. I always dislike the part of carrying a firearm as a police officer and had many complications trying to qualify with firearm. During my time as a law enforcement officer, though the rules required me to carry one at all time, I chose not in order to protect my children from knowing I had one or tragically getting their hands on such firearm. My children were always told I had to get to my job to check out the firearm so they would not know I owned one. I was very ritual about leaving the weapon locked in my county owned vehicle when I left work so my children would never see it. I always believed I would have rather gotten in trouble at work for not having weapon on me, then to have one of my children

*DECLARATION OF MONICA VOSS*             **Page 6**

obtain my weapon with dangerous, possible fatal results. My children are worth more than a job. I sold every weapon I own when I very soon after I retired. I do believe my husband owns some kind of long firearm that he keeps under our bed. It is in a gray colored case which i have NEVER opened. Many years ago I gave my husband a trigger lock that was given away by the Harris County Sheriff's office that he has stated he placed on there. I have no clue what kind of firearm this is. My husband also has fingerprint locked safe next to our bed that he states he has a firearm in, but again I have never seen it and do not have access to it. Nor do I want access. I am not sure where belligerent and uncooperative suspect child abuse, comes from or how it is know that I have immediate access to firearm, or how I was illegally and dangerously interfering with a lawful child abuse/family violence investigation. I did tell them, as my right of being parent that I would not give permission for my child to be interviewed by CPS, and had explained my previous working with CPS, and I did not give my permission for my child to be interviewed by mental health services that were not of my choosing. That is my right as a parent. I only told them this but did not in any way interfere with them doing such. I even initiated her being interviewed by the police, nonetheless, out of my presence, as I knew I had nothing to hide. I never stopped or interfered with them doing such even though it was done without my permission. They never even attempted to speak with my husband after the joking and made to believe everything was fine. *There is no mention of what the interference was from any reports/supplements of that night. This was only stated after the lawsuit was filed.* Deputy McGuigan states several times in his report I was "verbally argumentative. Interference has to be more than verbal. Deputy McGuigan also states in his report I was told to go inside my residence to get my ID but I refused. Now they are claiming they arrested me because they were afraid I would go inside near firearms. Neither Deputy Goode, nor Deputy McGuigan called anyone from mental health or child protective services until Sgt. Ellis

arrived. Deputy Goode even admitted on recording that this incident was not going to need an Emergency Order of Detention. So if he believed that but still carried an investigation of such indicates he was only being unprofessional and vindictive. He never called CPS or Mental Health as he stated in the audio, until his supervisor got there. He told me, as stated on video/audio we were having to wait for supervisor due to my request, when in fact he had called and was waiting for supervisor prior to me asking. This case was never indicated to be family violence or child abuse, nor was it referred to any such investigative department of the sheriff's office after the initial report. Most larger police agencies will require cases of suspected child abuse or family violence to be forwarded to appropriate division for follow up investigation. To my knowledge this case was forwarded to Crisis Intervention Division where I received a call from a deputy from such division approximately NINE months later to inquire if I needed anything. This is indicated in a supplement attached to this case.

26. Regarding page 3 of Goode's MSJ: The original report came into the Fort Bend County Sheriff's office from CPS that the child was depressed and either thinking of hanging herself or drowning herself. Since CPS original call had been received around 1pm this day, and Deputy Goode was responding around 11:30 pm, there doesn't appear to be real emergency. I believe in my experience as a law enforcement officer of more than 20 years, if I got a call of such, I would have asked the parent if the child was suicidal and have the parent protect child from such suicidal attempts. When Deputy Goode arrived at my house I had K.V. come out to speak with him so I could show him she was fine. I also had my husband come speak with him. Deputy Goode makes no mention of ever speaking with or identifying my husband. My husband and I spoke with Deputy Goode, in the presence of K.V. We were both surprised about these allegations as we did not have any indications of such depression from K.V. We also both know she sees a doctor

regular and it on medication for behavioral issues. We were laughing and joking about law enforcement jobs, as we had all been in law enforcement. My husband believed everything was OK, as we were all just talking very friendly, as my husband had to get up to go to work at 4:30am. Deputy Goode assured both of us he was there checking on a report made to CPS about K.V. being possible suicidal. I did tell Deputy Goode I did not care for CPS, after having worked with them for many years on child abuse investigations. Even though I did not care for CPS, I was more than happy for him to interview K.V. even suggested him to do so out of my presence. I made the first suggestion for Deputy Goode to interview K.V. separately as I wanted to make sure for him to know I had nothing to hide and know I am a good parent. At first Deputy Goode refused and stated he did not need to interview her away from me.

27. Regarding page 3 of Goode's MSJ: Again there is no specific actions of interfering. Not only did Deputy Goode not tell me not to go inside my residence, he plainly told me to go inside my residence. It is very clear on the video/audio as I was going to go inside my residence, when Deputy Goode instructed me to stop, I did and he demanded my identification. I immediately stopped and told him I did not have my and he instructed me to get it. Deputy Goode stated several times during this incident that I was under arrest for Failure to ID. So doesn't appear to be mistake. Deputy Goode also did not release me to move about freely. The supervisor did, and even then it can be heard on audio/video of Deputy Goode attempting to tell Sgt. Ellis not to let me go get soda. I was never told I was no longer under arrest. Sgt. Ellis just apologized repeated and told me this was all a mistake that had gotten out of hand.

28. There was absolutely no evidence to suggest a felony had been committed against K.V. Any reasonable person would have been able to see K.V. had changed her story, and just as determined by mental health professional and Sgt. Ellis, K. V. was only a teenager wanting a little

*DECLARATION OF MONICA VOSS* Page 9

extra attention. K. V. made no credible accusations of any criminal actions. There is no ongoing feud between myself and the "other" adult, known as Sandra Edwards. I have instructed this person not to contact myself, my daughter, or any member of my immediate family. Edwards has continued to contact my daughter, myself, my sons, my husband, and to cause, as proven by several professionals, my daughter K.V. to be depressed. Another agency has investigated such, filed criminal charges on Edwards, and issued a warrant for her arrest. Fort Bend County Sheriff's office continues to refuse to do their obligated duties to arrest her even after receiving several official request from another police agency. The Pflugerville Police Department Deputy, a Certified Mental Health officer, interviewed K.V. at length and stated K.V. was not depressed until Sandy Edwards convinced her she was depressed.

28. Regarding Exhibit 2 of Goode's MSJ (McGuigan Exhibit) states he personally observed me to commit "Interference with Public Duties" but gives no specifics. He is also recorded on their audio as inquiring if I should be arrested for "Abandonment of Child" when in fact Goode had clearly told me they had custody of my daughter.

29. Regarding Exhibit 2 (Ellis affidavit) of Goodes MSJ, Sgt. Ellis was the one who allowed me to get a soda, still under arrest and followed into my house. Ellis explained to me it was all a big misunderstanding and apologized several times. Told me K.V. wasn't really depressed at all that she was just wanting a little extra attention. He agreed Deputy Goode had agitated the situation by asking in front of K.V. if K.V. was my natural child or by adoption. He even came in my house after the mental health professional completed her interview of K.V. and was in my kitchen laughing and apologizing for Deputy Goode and stated repeatedly it had all been a misunderstanding. At one time, while he and I was in the kitchen laughing and talking, my

husband heard us and opened the bedroom door to see us and didn't think much about it because he could see we were just talking and laughing.

30. Regarding Page 10 of Goode's MSJ there was no report of abuse. CPS had stated the call came in around 1PM that day that child was talking about hanging herself or drowning herself. There was no imminent threat of suicide by K.V. K.V also told them she was not going to harm herself during the first part of them interviewing her. I have dealt with suicidal and mental health issues in work and with older son. I do have experience with these issues. If a child is truly suicidal, unless removed from parents, then parents are notified and care for said child. Any mental health officer knows this.

31. Regarding Page 11 of Goode's MSJ the last sentence states this may stem from family member's child abuse. Suicidal threats from teenagers are caused by many things.... including teenage social issues. Deputy Goode was told by both I and my husband Mark of her mental health treatment and medication.

32. Regarding Page 12 of Goode's MSJ I was the one who suggested K.V. be interviewed by Deputy Goode away from parents as she knew she had nothing to hide. Had Monica been abusive or trying to hide something she would never have suggested K.V.be interviewed out of her presence. I absolutely told Deputy Goode I would not give my permission to CPS to interview K.V. as I had worked with them in the past. He also laughed about this along with my husband. Again, not only did I insist K.V. be interviewed by Deputy Goode, K.V. has been interviewed with permission by many law enforcement since this incident and there has never been any cause for concern of abuse.

33. Regarding Page 13 of Goode's MSJ K.V. stated in the interview she did not want to harm herself and she wasn't suicidal. Deputy Goode was told of K.V.'s mental health issues,

and of her being on medication for ADHD as well as Oppositional Defiance Order. Deputy Goode is on the audio recordings stating after knowing of K.V. statements that he did not believe she would warrant any kind of emergency order of detention, but yet he continued to request such wasting resources and being vindictive and controlling. If K.V. had made statements she was not suicidal, as is in the recordings, why would he believe she was suicidal. She had no injuries.

34. I never I attempted to interfere with Deputy Goode's desire to place K.V. in a squad car, and there are no specifications of such.

35. When I started towards my house I truly believed they had custody of K.V. and I was free to do as I chose.

36. Deputy McGuigan did not arrive at the same as Deputy Goode. Deputy McGuigan was not present when Deputy Goode first arrived and spoke with myself, K.V. and my husband. None of this conversation is on any recording.

37. Deputy McGuigan was not with Deputy Goode when I answered the door.

38. K.V. did not immediately come to the foyer. I went to her room to get her and told her the police was there because she was suicidal. As K.V. went to the front foyer, I opened master bedroom door and told my husband the police was there and to come into the foyer. Deputy McGuigan was not present during this time. My husband and I talked and laughed with Deputy Goode. We talked about being in law enforcement and how we did not care for CPS. At no time did either of us get argumentative. I did state very friendly that I would not give my permission for my daughter to be interviewed by CPS. At this time there absolutely no mention of any abuse allegations. Deputy Goode very plainly told us it was just K.V. had made some remarks to someone about being suicidal. K.V. denied in front of us that she was remotely suicidal. Deputy Goode even stated he did not always agree with CPS. I also told Deputy Goode I had been told

recently K.V. was conspiring and threatening to call CPS on me. This was over normal teenage/parental issues such as privileges, school choice, friend choice, etc. I know I am a good parent and had nothing to hide and had never abused my child so I initiated and insisted he interview K.V. outside away from me. My whole world is my children. There was absolutely no resistance or any other issues.

39. I later learned from listening to audio it appears Deputy Goode had some issues with adoption as he can be heard on audio stating the whole problem was because K.V. was an adopted child. If Deputy Goode or Deputy McGuigan was so concerned about any kind of family violence they never once attempted to call or speak to my husband about such. Giving a suicidal outcry to friend does not in no way suggest abuse or neglect by a family member. This report was for possible suicide or drowning not abuse.

40. K.V. stated she was no longer suicidal, but they continued to be vindictive and controlling. There were no injuries claimed by or found on K.V. Deputy Goode did not tell me I was not free to leave until he placed me under arrest when I refused to go inside my house to get my I.D. Deputy Goode did not contact CPS, but instead Deputy McGuigan did at which time CPS indicated they would not come to the residence and suggested this may be an unhappy teenager.

41. K.V. has been under mental health care but only after these events was she treated for depression, but takes no medication for it. She takes guanfacine, but not for depression. She also takes ritalin type medication Both medications are for ADHD type behaviors and oppositional defiance disorder, and bipolar type behaviors. K.V. is known to be defiant and deceitful. This information is well documented in medical, psychiatric, and educational records. K.V. has always been known to create drama and draw herself to be the center of attention and create chaos.

42. I did not sign any kind of no harm agreement and do not believe K.V. did either, as it is not included in medical records of K.V. Voss obtained from Texana Mental Health.

43. Deputy McGuigan corroborates my story of Deputy Goode arriving prior to him and having already made contact with K.V. and Monica Voss.

44. I declare, certify, verify, and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATE:

_June 27_, 2018

Monica Voss, Declarant